*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 28**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GENESIS AGGREGATES B, LLC and GENESIS AGGREGATES G, LLC,
*Appellants,*

*v.*

TOLL SOUTHWEST LLC,
*Appellee.*

No. 20240369
Heard February 26, 2025
Filed August 7, 2025

On Direct Appeal

Fourth District Court, Provo
The Honorable Derek P. Pullan
No. 210400778

Attorneys:

Karra J. Porter, Todd Weiler, Salt Lake City, for appellants

Peter C. Schofield, Justin W. Starr, Joseph V. Osmond,
Christopher M. Sanders, Lehi, for appellee

JUSTICE POHLMAN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE,
JUSTICE PETERSEN, and JUSTICE HAGEN joined.

JUSTICE POHLMAN, opinion of the Court:

## INTRODUCTION

¶1 Genesis[1] and Toll Southwest LLC are cotenants of the subsurface estate of a .225-acre plot of land in Utah County, each owning a one-half undivided interest in the parcel's sand, gravel,

---

[1] We refer to Genesis Aggregates B, LLC and Genesis Aggregates G, LLC collectively as Genesis.

and clay (collectively, soil). Toll is the exclusive owner of the surface estate. Genesis brought this action against Toll, claiming that Toll interfered with Genesis's rights by extracting, exporting, and using the parcel's soil without compensating Genesis. Toll moved for summary judgment, arguing that it did not export soil from the parcel and that Genesis has no right to compensation for Toll's use of soil that remains on the parcel. The district court agreed with Toll and dismissed Genesis's claims.

¶2    Genesis now challenges the district court's ruling. It first contends that the court erred in dismissing its claims premised on its factual allegation that Toll removed soil from the property and transferred it to a third party. Genesis concedes that it lacks affirmative evidence to prove its charge, but it claims a jury could reasonably infer that Toll transferred the materials off-site because, according to Genesis, Toll lacks credibility and had exclusive control of the information relevant to the claim. We disagree. Genesis, as the party bearing the burden of proof at trial, was obligated to produce evidence to support its factual claim that soil had been transferred off-site. Because Genesis did not identify any evidence from which a jury could reasonably infer that Toll removed soil from the parcel, the court correctly granted summary judgment to Toll.

¶3    Next, Genesis contends that, even if no soil was removed from the parcel, it is entitled to compensation because Toll interfered with Genesis's use of the parcel's soil by blocking access to it, or because Toll derived a benefit from using Genesis's one-half interest in the soil. We reject these claims. As the owner of the parcel's surface rights, Toll had "an absolute right . . . to the necessary support of [its] land" and to "improve and use the surface" as Toll saw fit, provided it did not "interfere with" Genesis's subsurface rights. *See Stephen Hays Est., Inc. v. Togliatti*, 38 P.2d 1066, 1070 (Utah 1934). Genesis has assumed that Toll's use of the soil constitutes "interference" with its rights, but Genesis has not established what rights it holds in the soil or that a surface owner's on-site use of the soil constitutes interference with those rights under either the parties' deed or common law.

¶4    Accordingly, we affirm the district court's summary judgment decision and dismissal of Genesis's claims.

## BACKGROUND[2]

¶5   In 1945, A.W. and Mirl C. Olsen sold a large tract of land on Traverse Mountain in Utah County. In the deed of conveyance, the Olsens "reserve[d] to themselves and to their heirs, successors and assigns an undivided one half interest in any and all minerals, hydrocarbons, including oil, and any and all commercial deposits of sand, gravel and clay in or on said premises."

¶6   Within the tract of land described in the 1945 deed is the single .225-acre lot at issue in this case (parcel). As successor-in-interest to the Olsens, Genesis owns a one-half interest in the parcel's subsurface minerals and commercial deposits of soil. Toll owns the parcel's surface estate and the other one-half interest in the parcel's subsurface estate.

¶7   Toll developed the parcel as part of its larger development across several acres of property on Traverse Mountain. Toll excavated soil from the parcel and used it as fill on the same parcel to create the desired grade and density.

¶8   Genesis subsequently filed suit against Toll, demanding an accounting and asserting claims for breach of fiduciary duty, waste, conversion, unjust enrichment, and constructive trust and disgorgement. Genesis's claims were premised on its allegation that Toll extracted, sold, or used the parcel's soil in which Genesis claimed an interest. Genesis specifically alleged that Toll "removed at least 54,875 cubic yards of sand, gravel, and clay" from the parcel and that Toll transported the soil to other parcels owned and controlled by Toll or third parties.

¶9   After fact discovery closed, Toll moved for summary judgment on Genesis's claims. Toll presented evidence that it did not remove any soil from the parcel and that "[t]he soil on the property was used in its native form and only for grading and backfill." Thus, according to Toll, the undisputed facts showed that "[t]his is a 'cut and fill' case," where it "cut" soil from parts of the parcel and used that material to "fill" other areas on the same parcel. And, citing a Utah Supreme Court case from 1934 in

---

[2] In reviewing a district court's grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party" and recite the facts accordingly. *Boud v. SDNCO, Inc.*, 2002 UT 83, ¶ 3, 54 P.3d 1131 (cleaned up).

support, Toll argued that because "[i]t merely exercised its surface rights by simply grading the soil, excavating, and building on top of the soil," Genesis had no viable claim. (Citing *Stephen Hays Est., Inc. v. Togliatti*, 38 P.2d 1066, 1070 (Utah 1934).)

¶10 Genesis opposed the motion. It conceded that "Toll had a right to develop the surface and excavate (one-half of) the subsurface [soil]." But, Genesis argued, "Toll did not have a right to . . . use or give away the other half without notice and compensation," nor did Toll have "the right to eliminate Genesis' 'use and enjoyment' of the [soil] by burying [it] under buildings and lawns." Genesis claimed it was entitled to damages for Toll's use of the soil on the parcel because Toll "received an economic benefit by not having to import" soil for use in its construction project. It also asserted that it was entitled to compensation for Toll's extraction and transfer of some 60,000 to 100,000 cubic yards of soil from its larger development to a third party.

¶11 The district court granted Toll's motion for summary judgment and dismissed Genesis's complaint. The court began by noting the absence of genuine factual disputes about Toll's excavation and use of the soil. It recited Genesis's original allegations regarding Toll's supposed removal of soil from the property, but it noted that Genesis "concede[d]" in oral argument "that it has no evidence that Toll transported or transferred ownership of any [soil] excavated from the Parcel."

¶12 The court then addressed the merits of Genesis's claims by considering two distinct underlying theories. First, to the extent Genesis's claims were grounded in the allegation that Toll sold or transferred soil from the parcel, the court concluded that those claims failed for a lack of evidence. Second, the court turned to the question of whether Genesis was entitled to damages for Toll's excavation and use of soil as fill on the same parcel. In the court's view, that question was answered by *Togliatti*, in which we held that "[t]he owner of the surface has an absolute right in the absence of an agreement to the contrary to the necessary support of his land. He may cultivate the surface or erect buildings thereon . . . ." 38 P.2d at 1070. The court also cited the analyses of the Washington appellate courts in *Saddle Mountain Minerals, L.L.C. v. Joshi*, 95 P.3d 1236 (Wash. 2004) (en banc), and *Saddle Mountain Minerals, L.L.C. v. Santiago Homes, Inc.*, 189 P.3d 821 (Wash. Ct. App. 2008). There, the courts addressed the question of whether a subsurface owner with rights to sand and gravel is entitled to compensation for a surface

owner's utilization of those materials for on-site development. And each court held that surface owners were entitled to use soil in developing their respective sites and that they owed no compensation to the subsurface owner unless the soil was exported off-site. *Joshi*, 95 P.3d at 1243; *Santiago Homes*, 189 P.3d at 825.

¶13 Applying these precedents, the district court resolved that "as the owner of surface rights Toll has an absolute right to excavate the Parcel and to improve the surface of the Parcel as Toll sees fit, so long as Toll does not interfere with Genesis's ownership of the subsurface minerals." And here, the court observed, "there is no evidence that Toll's cut and fill work on the Parcel interfered with Genesis's 50% interest" in the soil or otherwise "damaged Genesis." Thus, the court concluded, "Genesis is not entitled to compensation for [soil] that w[as] excavated but never transported from the Parcel."

¶14 Genesis appeals.

## ISSUE AND STANDARD OF REVIEW

¶15 Genesis challenges the district court's order granting Toll's motion for summary judgment. "We review a grant of summary judgment for correctness." *Heslop v. Bear River Mut. Ins.*, 2017 UT 5, ¶ 15, 390 P.3d 314. "We give no deference to the district court's legal conclusions and consider whether the court correctly decided that no genuine issue of material fact existed." *Id.* (cleaned up).

## ANALYSIS

¶16 Genesis asserts two primary errors with the district court's decision. First, Genesis contends that the court erred in dismissing its claims stemming from its allegation that Toll transferred soil off-site. Although Genesis concedes that it has produced no evidence that soil was moved off the parcel, it argues that a jury could reasonably infer that such a transfer occurred from the fact that Toll transferred soil from somewhere in its larger development to a third party.

¶17 Second, Genesis contends that the court erred in concluding that Toll did not interfere with Genesis's subsurface rights as a matter of law, arguing that Genesis is entitled to compensation for Toll's use of the soil even if the soil was never removed from the parcel.

¶18 We address Genesis's arguments in turn and conclude that the district court properly granted summary judgment to Toll.

I. GENESIS FAILED TO PROVIDE AN EVIDENTIARY BASIS FOR ITS CLAIM THAT TOLL REMOVED SOIL FROM THE PARCEL

¶19  Genesis argues that the district court erred in rejecting, for lack of evidence, its factual claim that Toll removed soil from the parcel and transferred it to a third party. Genesis's claim derives from Toll's transfer of some 60,000 to 100,000 cubic yards of soil from its larger development to a neighboring developer.

¶20 Genesis does not challenge the court's observation that Genesis "has no evidence that this cut material included any of the sand, gravel, and clay excavated from the Parcel." In fact, as the court recognized, Genesis "has no evidence that Toll transported or transferred ownership of *any* sand, gravel, and clay excavated from the Parcel." (Emphasis added.) Still, Genesis argues that the court "imposed too high a burden," and that a jury should be allowed to "draw inferences" about the origin of the transferred material because such information is "exclusively within" Toll's possession and is "not knowable" by Genesis without an accounting. We disagree.

¶21 To begin, the district court did not impose too high a burden on Genesis. The parties' relative burdens on summary judgment are well established. Where the moving party does not bear the burden of proof at trial, it may demonstrate its entitlement to summary judgment by presenting evidence to show no genuine issue of material fact exists, or by showing a lack of evidentiary support for an essential element of the opposing party's claim. *See Salo v. Tyler*, 2018 UT 7, ¶ 2, 417 P.3d 581. Once the moving party carries that burden, to avoid summary judgment the nonmoving party must produce affirmative evidence, beyond mere reliance on the pleadings, showing that "there is a genuine issue for trial." *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054 (quoting UTAH R. CIV. P. 56(e)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986).[3] And "[t]his is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257.

---

[3] In *Salo*, we held "that the Utah summary judgment standard is in line with the federal standard." 2018 UT 7, ¶ 2. Accordingly, we may refer to federal cases for guidance. *See Arbogast Fam. Tr. v. River Crossings, LLC*, 2010 UT 40, ¶ 16, 238 P.3d 1035.

¶22   As the moving party that did not bear the burden of proof at trial, Toll carried its burden on summary judgment by showing a lack of evidentiary support for Genesis's assertion that Toll removed soil from the parcel. In fact, Toll even went a step further and affirmatively refuted Genesis's claim. Specifically, Toll presented evidence that Toll did not transfer any of the parcel's soil to a third party, and that all the soil excavated from the parcel remained on-site. *See supra* ¶ 9. And with Toll having satisfied its burden, it was incumbent on Genesis to identify contradictory evidence. But it didn't. Instead, it conceded that it "cannot prove that any" soil was "exported or moved off of the [parcel]." Thus, the district court correctly concluded that Genesis failed to meet its summary judgment burden and that Toll was entitled to summary judgment on all claims arising out of this allegation.

¶23   Yet Genesis continues to resist this conclusion, arguing on appeal that a jury should be allowed to *infer* that soil was exported from the parcel either because Genesis lacked access to the information or because Toll lacks credibility. Neither argument persuades.

¶24 First, although a nonmoving party facing summary judgment is entitled to have "all *reasonable* inferences" drawn in its favor, that party is not entitled to "every *possible* inference of fact." *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588 (second emphasis added); *see also Kranendonk v. Gregory & Swapp, PLLC*, 2014 UT App 36, ¶ 15, 320 P.3d 689 ("[W]hile a plaintiff facing summary judgment is entitled to all favorable inferences, she is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture." (cleaned up)). A reasonable inference requires an evidentiary foundation. *See Heslop v. Bear River Mut. Ins.*, 2017 UT 5, ¶ 22, 390 P.3d 314. And here, that evidentiary foundation is lacking. That Genesis is not naturally in the position to know what Toll did with its soil does not provide the necessary evidentiary basis for a jury to reasonably infer that Toll removed soil from the parcel and transferred it to a third party.

¶25   Second, we see no support for Genesis's suggestion during oral argument that summary judgment was improper because a jury could infer that Toll removed soil from the parcel based on

"indicia" that Toll's testimony was generally untruthful.[4] To the contrary, courts applying the federal analog to Utah's summary judgment rule have routinely rejected attempts to defeat summary judgment based on claims that an opponent's evidence isn't credible. *See, e.g.*, *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) ("It is by now axiomatic that a nonmoving party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's [evidence]." (cleaned up)).[5] Genesis bore the burden of proving with affirmative evidence its allegation that Toll removed soil from the parcel. *See supra* ¶¶ 21–22. Simply leveling generalized attacks on Toll's credibility does not raise the genuine issue of material fact Genesis needs to defeat Toll's properly supported summary judgment motion.

II. GENESIS HAS NOT ESTABLISHED A LEGAL BASIS FOR ITS CLAIM THAT TOLL'S ON-SITE USE OF THE PARCEL'S SOIL INTERFERED WITH GENESIS'S SUBSURFACE RIGHTS

¶26 Apart from its claim that Toll removed soil from the parcel, Genesis argues that Toll's cut-and-fill operations on the parcel interfered with its subsurface rights. To address this question, we

---

[4] In support of its suggestion that Toll is generally untruthful, Genesis asserted that Toll "did not produce [a] title report" for the parcel and "claim[ed] not to recall what the document said," despite testimony from a Toll representative that the company obtained a title report. We need not resolve whether this shows Toll to be generally untrustworthy.

[5] *See also Anderson*, 477 U.S. at 256–57 (stating "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion" on summary judgment (cleaned up)); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies solely or in part upon credibility considerations . . . ."); *Curl v. Int'l Bus. Machs. Corp.*, 517 F.2d 212, 214 (5th Cir. 1975) ("The party opposing summary judgment must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and the opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." (cleaned up)).

begin by exploring general common law about the scope of a surface owner's rights in a severed estate.

¶27 It has long been recognized that in any given tract of land, "the surface may be owned by one person and the mineral underneath by another." *Smith v. Jones*, 60 P. 1104, 1106 (Utah 1900). "Minerals in place may be severed from the land, and when so severed they become separate and distinct estates, held by separate and distinct titles." *Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979); *see also Stephen Hays Est., Inc. v. Togliatti*, 38 P.2d 1066, 1070 (Utah 1934) ("When a surface right is conveyed apart from the minerals, two separate estates exist, each of which is distinct from the other . . . ." (cleaned up)).

¶28 This case involves such a severed estate. The parties agree that Genesis has a one-half interest in "any and all minerals, hydrocarbons, including oil, and any and all commercial deposits of sand, gravel and clay in or on" the parcel, while Toll owns the entirety of the surface estate and the remaining one-half interest in the subsurface estate. But the parties dispute the scope of the rights that come with ownership of their respective estates.

¶29 "Since the 1930s, the term 'surface' has largely been regarded as a word of clear meaning, unless that meaning is plainly altered by other language in the instrument of conveyance."[6] *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461, 478 & n.101 (W. Va. 2013) (citing cases). Specifically, "surface" "generally means the exposed area of land, improvements on the land, and any part of the underground actually used by a surface owner as an adjunct to surface use," such as for "basements, or construction footings." *Id.* at 480–81; *see also Shell Oil Co. v. Moore*, 48 N.E.2d 400, 404 (Ill. 1943) ("[T]he

---

[6] In determining the scope of the rights reserved under a deed, we would ordinarily look first to the deed to determine the parties' intentions. *See Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 21, 337 P.3d 213 (explaining that "[d]eeds are to be construed like other written instruments" and that "we determine the parties' intent from the plain language of the four corners of the deed" and resort to parol evidence only where that language is ambiguous (cleaned up)). In arguing this case, neither side has undertaken a textual analysis of the particular language of the 1945 deed. We thus follow their lead and resolve their dispute based on general common law principles.

conveyance of 'surface' . . . has the effect of passing title to the top surface of the land, together with such ancillary use of a portion under the surface for . . . foundations and other uses as will render it suitable and usable for the purposes intended."); *Wilkes-Barre Twp. Sch. Dist. v. Corgan*, 170 A.2d 97, 99 (Pa. 1961) ("The term 'surface' . . . is seldom, if ever, limited to mere geometrical superficies.").

¶30  So, when the surface estate is severed from the subsurface estate, the law provides that the surface owner enjoys the right to subjacent support,[7] the right to lateral support,[8] and the right to utilize the subsurface as needed for surface use unless the surface owner has waived those rights. *See Morgan*, 745 S.E.2d at 480–81 ("[T]he word 'surface,' when used in an instrument of conveyance, generally means the exposed area of land, improvements on the land, and any part of the underground actually used by a surface owner . . . ."); *Haseman v. Orman*, 680 N.E.2d 531, 534 (Ind. 1997) ("Where title to the land and ownership of subsurface mineral rights are severed . . . the surface landowner enjoys the right to subjacent support of both the land and structures on it."); 53A AM. JUR. 2D *Mines & Minerals* § 365, Westlaw (May 2025 update) ("The owner of the surface is entitled to absolute support of the owner's land" "unless the surface owner has parted with or waived the owner's right in the matter.").

¶31  This court adopted this view of surface rights in *Togliatti*, 38 P.2d 1066. In that case, the plaintiff owned the mineral rights to

---

[7] Subjacent support is the support of the surface from below. In a severed estate, "the owner of subjacent rights must so conduct his operations as to leave support sufficient to maintain the surface in its natural state, and for failure so to do he may be liable for damages." *Colo. Fuel & Iron Corp. v. Salardino*, 245 P.2d 461, 466 (Colo. 1952) (en banc), *overruled on other grounds by Gladin v. Von Engeln*, 575 P.2d 418 (Colo. 1978) (en banc).

[8] The right of lateral support "embod[ies] the principle that the owner of land has a right to lateral support from the adjoining soil, and that the adjacent proprietor cannot remove the earth to such an extent as to withdraw the natural support of his neighbor's soil, without being liable for the injury." *Downs v. Lyles*, 41 So. 3d 86, 94 (Ala. Civ. App. 2009) (cleaned up).

a tract of land, while the defendant owned the surface rights.[9] *Id.* at 1067. The defendant used a shaft in the ground to extract copper from groundwater that had percolated onto the property, and the plaintiff sought to quiet title to the copper extracted from the groundwater, arguing that as the mineral owner it was entitled to ownership of the copper. *Id.* at 1067–69. The court considered the relationship between the surface estate and the mineral estate, explaining that the owner of surface rights generally has "such rights to the use thereof as are usually exercised by [an] owner in fee subject only to the right of the grantor to remove the minerals reserved." *Id.* at 1070. The court further explained:

> A surface right is not confined to the geometrical surface. *The owner of the surface has an absolute right in the absence of an agreement to the contrary to the necessary support of his land.* He may cultivate the surface or erect buildings thereon . . . . Should he desire a basement under his building, doubtless he would have a right to excavate the same[] . . . . In short, the owner of a surface right may improve and use the surface as he sees fit so long as he does not interfere with the rights of those who own the minerals.

*Id.* (emphasis added).

¶32 Thus, the takeaway from *Togliatti* is that absent an agreement otherwise, surface owners have broad rights to use and develop their land, including the right to excavate subsurface materials and to erect buildings thereon. *See id.* But those rights are not unlimited. *Togliatti* directs that the surface owner may "not interfere with" the right of the subsurface estate owner "to remove the minerals reserved." *Id.*

¶33 Although *Togliatti* is instructive in discerning the rights of the owner of the surface estate vis-à-vis the owner of the entirety of the mineral estate, it falls short of articulating the extent of Genesis's rights as a one-half owner in "any and all commercial

---

[9] The deed in *Togliatti* conveyed a "certain piece or parcel of surface ground" while "especially except[ing] from these presents" "all minerals on or in the land conveyed and the right to mine the same." 38 P.2d at 1067 (cleaned up).

deposits of sand, gravel and clay in or on [the parcel]."[10] In the absence of Utah authority, the district court turned to two cases out of Washington state where the appellate courts considered the parties' rights relative to soil in severed estates.

¶34 First, in *Saddle Mountain Minerals, L.L.C. v. Joshi*, Saddle Mountain owned the subsurface estate of a property, including the rights to "sand and gravel" and the express "right to enter upon the surface of the property for the purpose of drilling, extracting, operating, and working any extraction and processing facilities by any procedures whatsoever." 95 P.3d 1236, 1237 (Wash. 2004) (en banc). Saddle Mountain sued the surface owners, the Joshis, for damages caused by their development activity, which included cutting and filling areas of the property, building a road, and exporting sand and gravel from the property. *Id.* at 1238. The Washington Supreme Court held that "the Joshis were entitled to utilize the surface soil in developing the . . . site." *Id.* at 1243. "However, even if a surface owner can burden a mineral owner's right, it does not mean that the surface owner can export minerals without any compensation to the mineral owner." *Id.* So, while the court held that "the Joshis must compensate Saddle Mountain if they export sand and gravel from the . . . site," Saddle Mountain was not entitled to damages for the use of the soil that remained on the site. *Id.*

¶35 Likewise, in *Saddle Mountain Minerals, L.L.C. v. Santiago Homes, Inc.*, the same plaintiff brought a claim against a different developer on nearly identical facts. 189 P.3d 821, 822 (Wash. Ct. App. 2008). Applying *Joshi*, the Washington Court of Appeals held that the surface owner is "free to develop the property and Saddle Mountain is not entitled to compensation for minerals that are not

---

[10] Soil is generally not considered a "mineral" under common law. *See Norken Corp. v. McGahan*, 823 P.2d 622, 627 (Alaska 1991) ("Courts . . . are virtually unanimous in holding that gravel is not a 'mineral' in the legal sense of that word."); *see also State Land Bd. v. State Dep't of Fish & Game*, 408 P.2d 707, 708–09 (Utah 1965) ("[T]he reservation of 'coal and other minerals' . . . was not intended to include sand and gravel, either in the instant case or under usual circumstances."). So, although cases involving mineral rights are useful in defining the scope of a surface owner's rights in a severed estate, soil rights are not necessarily coextensive with mineral rights. *See infra* ¶¶ 41–43.

exported from the site." *Id.* at 825. But if the surface owner "exports sand and gravel from the property, [the owner] must make payment to Saddle Mountain." *Id.*

¶36 The district court here viewed the Washington courts' assessment of rights relative to soil as persuasive and consistent with the rules articulated in *Togliatti.* Thus, it concluded that like Saddle Mountain, Genesis "is not entitled to compensation for [soil] that w[as] excavated but never transported from the Parcel." According to the district court, Toll had "an absolute right" to excavate and use the sand, gravel, and clay as fill on the parcel, and that such use did not interfere with Genesis's subsurface rights.

¶37 Genesis disagrees with the district court's conclusion and insists that it is entitled to compensation for Toll's use of the soil, even if no soil was exported from the parcel. It advances two related theories of recovery supporting this proposition. First, it asserts that Toll "permanently interfered with Genesis's property rights" when it blocked Genesis's access to the soil by building "permanent structures" on the parcel. Next, Genesis asserts that its subsurface rights include the right to the "exclusive use" of the soil, so it was injured when Toll used the parcel's soil for its development project.

¶38 We examine each of Genesis's theories in turn and conclude that Genesis has not shown that either one has support in the law.

A. *Genesis Has Not Shown that It Has a Right to Compensation for Toll's Construction of Structures on the Parcel*

¶39 We turn first to Genesis's contention that Toll's use of the parcel's soil interfered with Genesis's subsurface rights by rendering the soil inaccessible. Genesis asserts, "The buildings, homes, and landscaping rendered Genesis's ability to develop its [subsurface materials] unreasonable and impractical because it would require Genesis to excavate through permanent structures."[11] On this basis, Genesis claims it is entitled to

---

[11] In its briefing, Genesis references "buildings, homes, and landscaping" constructed in Toll's development at large, but it does not point to evidence specifically identifying what has been constructed on the .225-acre parcel. We assume as true, for

(continued . . .)

compensation because Toll "permanently interfered with Genesis's property rights."

¶40   In making this argument, Genesis relies on legal principles governing mineral rights to define the scope of its rights with respect to the parcel's soil. Drawing from cases regarding the rights of mineral owners, Genesis claims that its rights include, among other things, the right to extract and sell the minerals, and the "'exclusive right to possess, use, and appropriate' as well as 'explore' for and 'obtain' the minerals." (Quoting *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 48–49 (Tex. 2017).) But Genesis has not persuaded us that these principles apply. Genesis has assumed, but has not legally established, that its half-ownership right in commercial deposits of soil on the parcel mirrors those rights generally enjoyed by the owners of subsurface minerals.

¶41 As Toll correctly points out, soil is generally not considered a "mineral" under common law. *See supra* ¶ 33 n.10. In interpreting the meaning of the statutory phrase "coal and other minerals" in *State Land Board v. State Department of Fish & Game*, we recognized some of the differences between soil and minerals like coal. 408 P.2d 707, 708 (Utah 1965). There, we stated that "in its broadest sense the term 'minerals' would include sand and gravel," observing that "under the common cliche that everything is either 'animal, vegetable or mineral' the term would include almost all material substances of the earth, its waters and even the air we breathe." *Id.* But we recognized that, in context, the term "other minerals" was properly understood as something which is "usually the subject of prospecting and mining, that is, something more valuable than the land in which they are contained and which are for that reason sought after and extracted from the land by mining, quarrying, or other special means for removal." *Id.* In comparison, we explained, "[s]and and gravel are among the most widely occurring materials in the earth's surface and in fact it is composed almost entirely of them in vast areas." *Id.* Thus, "[i]f the statute [at issue] were so construed as to reserve to the grantor these ordinary materials of the earth's surface, the effect in many instances would be to completely nullify the grant, which does not comport with reason." *Id.*

---

purposes of Genesis's argument, that Toll constructed at least one building and some landscaping on the parcel.

¶42 Our observations in *State Land Board* are not conclusive here. There is no question that Genesis owns a one-half interest in both the minerals *and* the commercial deposits of soil in the parcel. But as we recognized in *State Land Board*, there is a difference between minerals and soil. And so it is not enough for Genesis to simply label soil a mineral and import rules from caselaw applicable to minerals that are the subject of prospecting and mining and are generally considered to be "more valuable than the land in which they are contained." *Id.*

¶43 Indeed, at least one court has directly addressed this issue and has held that a reservation of soil rights does not entitle the soil owner to the same rights that mineral owners enjoy, such as the right to extract and remove the materials. In *Norken*, the deed at issue specifically reserved both minerals and "gravel deposits" as part of the subsurface estate, but the Alaska Supreme Court declined to treat gravel rights as part of the mineral estate. 823 P.2d at 624, 627–28. The court explained:

> The nature of gravel as the essence of the soil illustrates why it would be inappropriate to import mineral doctrines as a matter of law to the circumstances of this case. . . . [Because] removal of the gravel necessarily means destruction rather than mere use of the surface . . . [w]here, as here, the substance concerned is not a mineral in the legal sense and the deed contains no indication on its face that the parties intended the substance to be removed, we find no justification for concluding as a matter of law that a mere reservation of rights entails the right to destroy the surface of the land.

*Id*. at 628.

¶44 Genesis cites no authority that reaches a different conclusion. Instead, Genesis argues that the 1945 deed showed an intent for soil deposits to be treated like minerals. According to Genesis, "the deed itself defined minerals and hydrocarbons to include 'sand, gravel, and clay'" by providing Genesis with an "undivided one half interest in any and all minerals, hydrocarbons, including oil, and any and all commercial deposits of sand, gravel and clay in or on said premises."

¶45 But Genesis misreads the 1945 deed. Contrary to Genesis's claim, it refers to three separate categories of interests. First, minerals. Second, hydrocarbons, including oil. And third,

15

commercial deposits of sand, gravel, and clay. The deed does not define minerals and hydrocarbons to include soil. And more importantly, even if soil was captured by the deed's definition of minerals, Genesis hasn't shown that cases applying common law principles to more valuable minerals that are usually the subject of prospecting and mining apply with equal force to soil. In other words, soil is different, and Genesis has not shown us why soil should be treated like other minerals for purposes of assessing the parties' respective rights in the severed estate.[12]

¶46 Finally, even if we were to apply common law mineral doctrines to Genesis's rights to commercial deposits of soil and assume that Genesis's reserved rights entitle it to extract the soil from the parcel, the critical question for purposes of Toll's summary judgment motion is whether Genesis has shown that Toll interfered with that right. We conclude that Genesis has not made that showing.

¶47 Genesis contends that Toll's development of the surface interfered with its soil rights because Genesis would have to "excavate through permanent structures" to access the parcel's soil. In other words, Genesis suggests that because it might, in the future, want to use, remove, sell, or license its interest in the parcel's soil, it has been injured by Toll's development. But there is no evidence that Genesis uses or has plans to use the soil in this way.

¶48 In *Togliatti*, we expressed concern about a surface owner's interference with a mineral owner's "present or prospective mining operations." 38 P.2d at 1070. But because Genesis has no "present or prospective" operations relative to the soil, it has not been injured. The undisputed evidence shows that Toll did not remove soil from the parcel, and thus Genesis retains the same rights with respect to it as it did before Toll's development. Assuming the deed vests Genesis with the right to extract, sell, or license soil, it could

---

[12] Toll contends that because soil is different from other types of minerals, we should adopt a rule that "when a grantor reserves rights in sand, gravel, and clay, absent express language or clear evidence to the contrary, all he is reserving is the right to royalties, should the sand, gravel, and clay ever be developed for commercial purposes . . . . Otherwise . . . the reservation would destroy the grant." Adopting this rule might make sense. But because we need not generally define the extent of a party's subsurface rights in soil to resolve this case, we decline Toll's invitation.

still attempt to exercise that right. But without evidence that Genesis has been prevented from exercising its right, Genesis cannot show that Toll "interfered with any present or prospective . . . operations" of Genesis. *See id.* Thus, the district court was correct to conclude that Genesis has suffered no harm by Toll's use of the soil as fill on the parcel and that Genesis's claim fails as a matter of law.[13]

  B. *Genesis Has Not Shown that It Is Entitled to Compensation*
    *for Toll's Use of the Parcel's Soil*

¶49 Genesis next contends that Toll's use of the parcel's soil for even its on-site development constituted actionable interference with what Genesis describes as its "exclusive right to possess, use, and appropriate" the parcel's subsurface materials. (Quoting *Lightning Oil*, 520 S.W.3d at 48.) Genesis advances two theories in support of this claim. First, it contends that it is entitled to compensation for that interference because Toll moved soil within the parcel from its natural resting place. Second, it asserts that because Toll saved money by using Genesis's soil and not having

---

  [13] The parties disagree about whether and how the "accommodation doctrine" should be applied in this case. The accommodation doctrine provides that the owner of mineral rights may "extract [minerals] notwithstanding surface damage," but "where there is a reasonable and practical alternative which could be pursued to minimize damages to the fee holder, that should be done." *Flying Diamond Corp. v. Rust*, 551 P.2d 509, 511 (Utah 1976); *see also City of Lubbock v. Coyote Lake Ranch, LLC*, 440 S.W.3d 267, 272 (Tex. App. 2014), (discussing the accommodation doctrine generally). Whether or not this doctrine applies in the soil context is an open question. But even if we assume the doctrine is generally applicable, resolution of its potential application here would be premature. *See Archuleta v. State*, 2020 UT 62, ¶ 37, 472 P.3d 950 ("An issue is not ripe if there exists no more than a difference of opinion regarding the hypothetical application of a provision to a situation in which the parties might, at some future time, find themselves." (cleaned up)). Because Genesis has made no attempt to access the parcel's subsurface materials, there is no actual dispute over the feasibility of soil extraction from the parcel and no evidence of how any attempt to extract soil would impact the surface estate. Thus, we leave resolution of this question for another day.

to import soil for fill, Genesis is entitled to a share of the cost savings.

¶50  In support of its first theory, Genesis argues that a surface owner must purchase the soil from a subsurface owner to use it even for ordinary surface uses. As Genesis put it, "We're entitled to 50% when our interest is used . . . [and] when [Toll] pay[s] for it, they get [title to] it." In other words, "it's kind of a sale. [Toll] used our stuff, and . . . in essence we're selling it to [them] now in the form of damages."

¶51 But this novel theory finds no support in contract or caselaw. Genesis points to no language in the 1945 deed, nor any precedent from this court or sister states, that requires a surface owner to compensate the subsurface owner for displacing soil within the bounds of the property. Instead, Genesis relies on a statement from the Texas Supreme Court in *Lightning Oil* that "a mineral lease . . . includes the exclusive right to possess, use, and appropriate gas and oil." 520 S.W.3d at 48 (cleaned up).

¶52  Genesis's reliance on *Lightning Oil* is misplaced. *Lightning Oil* concerns mineral leases in the oil and gas context and does not address the rights associated with soil ownership. *See id.* As we have explained, soil is not considered a "mineral" under common law, and Genesis has not persuaded us that minerals and commercial soil deposits are equivalent. *See supra* ¶¶ 41–43. So, it is not apparent that Genesis enjoys the rights described in *Lightning Oil* with respect to the parcel's soil. But even if we were to conclude that *Lightning Oil* applies here, the case itself undermines Genesis's argument. While the *Lightning Oil* court makes clear that a mineral lease grants rights to "explore, obtain, produce, and possess" minerals, it also explains that a mineral lease does not grant the right to control "the specific place or space where the minerals are located," meaning that "an unauthorized interference with the *place* where the minerals are located constitutes a trespass as to the mineral estate only if the interference infringes on the mineral lessee's ability to exercise its rights." 520 S.W.3d at 49. So, under *Lightning Oil*, Genesis would be entitled only to the soil itself, without regard to its position on the property. *See id.* This principle undermines Genesis's assertion that because Toll moved soil to a different location within the parcel it is entitled to compensation.

¶53 Additionally, Genesis's assertion that it is entitled to compensation for Toll's use of the soil is inconsistent with our opinion in *Togliatti*, which makes clear that a surface owner "has an

absolute right in the absence of an agreement to the contrary to the necessary support of his land" and "may improve and use the surface as he sees fit." 38 P.2d at 1070. Nowhere in *Togliatti* does this court suggest that a surface owner's right to use the surface is subject to an obligation to compensate the subsurface owner for such use. In fact, as we have explained, courts that have examined the rights of soil owners have reached the opposite conclusion: that a surface owner "is free to develop the property and [the subsurface owner] is not entitled to compensation for [materials] that are not exported from the site." *Santiago Homes*, 189 P.3d at 825; *see also Joshi*, 95 P.3d at 1243 (explaining that a surface owner is "entitled to utilize the surface soil" but "must compensate [the subsurface owner] if they export sand and gravel" from the property).

¶54 Second, Genesis alternatively argues that it is entitled to compensation because Toll benefitted financially from using the parcel's soil. Specifically, because Toll did not have to purchase fill from a third party and thus "saved . . . money" in developing the parcel by using Genesis's soil, Genesis argues that it is "entitled to 50% of what it would have cost [Toll] to buy that fill elsewhere."

¶55 Genesis, however, cites no authority to support its view that a surface owner must compensate a subsurface owner whenever it derives some benefit from using the soil on the property. And its reliance on the theories of conversion and unjust enrichment are equally unavailing.

¶56 To prevail on its claim for unjust enrichment, Genesis would have to show that: (1) it conferred a benefit on Toll, (2) Toll "appreciate[d] or ha[d] knowledge of the benefit," and (3) Toll retained the benefit "under such circumstances as to make it inequitable for [Toll] to retain the benefit without payment of its value." *See Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶ 13, 12 P.3d 580 (cleaned up). Here, Genesis has not shown that its unjust enrichment theory is viable because it has not shown that Toll's use of the parcel's soil in a manner consistent with surface ownership could be considered "inequitable" under the circumstances. *See id.* By purchasing the surface rights to the parcel, Toll acquired the right to "improve and use the surface as [it] sees fit." *Togliatti*, 38 P.2d at 1070. So, by using the parcel's soil for development on the parcel's surface, Toll was exercising its lawful rights as the surface owner. Further, any benefit that Toll enjoyed from its use of the parcel's soil cannot be said to be *conferred* by

Genesis when Toll, as the surface owner, has an independent right to "use the surface." *See id.*; *Desert Miriah*, 2000 UT 83, ¶ 13.

¶57 Genesis's conversion theory fares no better. A claim for conversion requires "an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 15, 243 P.3d 508 (cleaned up). Genesis has not made this showing. To start, Genesis has not shown that the soil Toll moved within the parcel is subject to a conversion claim. Courts have held that "earth, sand, or gravel in its original bed is a part of the realty and, as such, cannot be the subject of an action for conversion." *See, e.g., Collins v. Intervest, Inc.*, 418 So. 2d 1030, 1031 (Fla. Dist. Ct. App. 1982). Only when soil has been "wrongfully severed from its original bed, removed and placed on other land" does it become personal property that may be converted. *See id.* at 1032; *see also Dahlstrom Corp. v. Martin*, 582 S.W.2d 159, 161 (Tex. Civ. App. 1979) ("Earth or sand in its original bed is a part of realty and as such cannot be a subject of conversion; but where it has been wrongfully severed and removed, it becomes personalty for the conversion of which an action will lie.").[14] Here, because Genesis has not produced any evidence that soil was

---

[14] The terms "severed" and "removed" in these cases appear to refer to soil that is excavated and taken off the property, rather than merely displaced within it. *See Collins*, 418 So. 2d at 1031 (alleging that the appellee "trespassed upon [the appellants'] land and removed large amounts of soil and fill material" and then "placed the soil upon nearby parcels of land"); *Dahlstrom*, 582 S.W.2d at 161 ("It is undisputed that employees of the Dahlstrom Corporation entered upon a tract owned by the appellees without permission and thereafter removed some 70,000 cubic yards of soil from the land. This soil was removed from the premises . . . ."). Here, though the soil was removed from its natural bed, it remained within the bounds of the parcel. *Cf. Schulenberg v. Harriman*, 88 U.S. (21 Wall.) 44, 64 (1874) ("Whilst the timber was standing it constituted a part of the realty; being severed from the soil its character was changed; it became personalty . . . ."). But we ultimately need not resolve the question of whether the displaced soil here constitutes realty or personalty, because Genesis's conversion claim fails on other grounds.

removed from the parcel, Genesis has not shown that its conversion theory applies.

¶58  Next, even assuming the soil that remains on the parcel is subject to an action for conversion, the undisputed facts show that Toll had "lawful justification" for its use of the parcel's soil. *See Lawrence*, 2010 UT App 313, ¶ 15 (cleaned up). As the surface owner, Toll has the right to use the land in ways necessary for development, including reasonable use of subsurface materials. *See Togliatti*, 38 P.2d at 1070. Because Genesis has not shown that the soil that remained on the parcel is subject to conversion or that Toll's use of it was unlawful, its conversion claim fails for this additional reason.

¶59 In sum, Genesis has not presented a viable legal theory supporting its assertion that it is entitled to compensation for Toll's use of the parcel's soil. We therefore affirm the district court's conclusion that Genesis "has suffered no damage" as a result of Toll's cut-and-fill operations on the parcel.

## CONCLUSION

¶60 We conclude that the district court correctly granted summary judgment in favor of Toll. Genesis failed to provide any evidence to support its allegation that Toll removed soil from the parcel. Additionally, Genesis has not shown that Toll's on-site use of the parcel's soil constituted actionable interference with Genesis's one-half interest in any commercial deposits of sand, gravel, and clay in or on the parcel. Accordingly, we affirm the district court's grant of summary judgment in Toll's favor.